Good morning, Your Honors. Alan Yockelson on behalf of Appellant Barbara Rader. I'd like to reserve, if I might, five minutes for rebuttal. In preparing for oral argument, it occurred to me that the Court might think that counsel in this case are talking about two different people. On the one hand, you have the government view of Ms. Rader. That's not so unusual, either. Well, in here, it's pretty obvious. You probably don't practice criminal law much. Oh, actually, I do. As you know, the prosecution's view of the defendant and the defense lawyer is different. But in any event, this is summary judgment, so we have to go with your view, right? Well, I would argue and agree with that, for sure. So what's your best case? The best case here is the timeline. If you look at this case globally and look at the timeline that I've – and I've prepared it here. Ms. Rader was hired in November. So is it in your brief? Oh, yeah. All the elements are. No, no, the timeline. No, no. Oh, this is just the oral timeline. This is just – this is – Perfectly fine. It's all there. I just thought if you'd written it down, I would follow along on the page. Oh, no, no. No, I apologize. No, no, no. No, no, no. That's fine. That's fine. Just go ahead. But she was hired in November of 2008, and she began working in March of 2009. Between March and April, she had attended orientations and trainings and then began working under Mr. Maito Magato on May 11, 2009. May 27, she has an argument, for lack of a better term, with Mr. Magato and her mentor, Ms. Wong, for which she is counseled for having a negative attitude, and she apologizes. June 10, she's ordered to work through her lunch hour because of being behind on some of her reports. And then we get to June 22. On June 22, unbeknownst to Ms. Rader, a probationary evaluation report is prepared. And the more I looked at that probationary report, the more I realized that despite having five areas where she needed improvement, she had numerous areas where she was working satisfactorily. And on top of that, the recommendation by the supervisors was to retain her, to keep her employed, and that was on June 22. Then we come to September 15, and on September 15, she is given permission to work independently. She is also told that the quality of her work is good, and she is certified to sign off on IBIS resolutions. The very next day, September 16, she asks for a change of her day off so that she could take the holiest of holy holidays off Yom Kippur. And on September 23, she's terminated. Wasn't she allowed to take that day off? Well, yes or no. Was she? She was allowed to change her date. However, she was terminated before the 28th of September came, so she never really did get that day off. But she was allowed to take it off, right? She was accommodated in that request, but she was, again, terminated before she could avail herself of that accommodation. And when you go through and look at the fact that her quality of work, nobody disputes was good. What they say is her attitude was bad, and it's an interesting concept. I'm married to a professor of education who has schooled me on different learning styles, and I'm sure your honors have dealt with law clerks that have had different learning styles. Some people just need to know, what do I do? What are the steps? Other learners need to know the why to understand what to do. But this is why we have probationary periods in federal employment and some other areas as well, because there are a lot of intangible factors that go into making an employment decision. And if you think the employee has got a poor attitude or isn't working as hard or as effectively as he should, you may decide not to hire, and that's what probation is. So your burden is here on a Title VII, so you have to show that there was discrimination, which includes sexual harassment. It's not enough to say she was working out pretty well and she should have been kept on. You have to actually show that either sexual harassment or sexual discrimination or religious discrimination or handicap discrimination were motivating factors. And then we go through the Griggs analysis. And I've listened carefully to your timeline, and I don't see where you've come close to meeting that burden. Well, and I will address that specific question because on September 23rd, as she was being ushered to pick up her termination letter, according to Ms. Rader, she was told by her direct supervisor, you should have F'd me. I refrained from using the word, although I used it in the brief. It's all right. It's all right. What else here? Yeah. But by that time, the decision to terminate had been made, and assuming, as we must, that the remark was made, it can't possibly be a motivating factor for something that was already a decision that had already been made. Well, I think I would disagree for this reason. I think that that statement becomes illuminating to other behavior that was alleged by Ms. Rader in this case, that there was disparate treatment in the workplace. She was treated differently than the women in the office who were flirting back and forth with the supervisor, and that she was, again. As I understand it, the best allegations you have is that the man was flirting with a female co-worker, showing favoritism to women, and then this comment after she'd already been terminated. But if we talk about did the man ever touch another female? No. Did he ever make any inappropriate comments to them? No. Did he do any more than have smiling and body language, a very pleasant attitude, favoritism? No. Did it affect her performance? No. I guess I'm trying to figure out why this doesn't go right into an isolated comment. Well, even if it was an isolated comment, there is case law that says you look at the severity. Well, I understand. That's why I tried to put all the conduct you've alleged out here in front of you and let you talk about it. And I can't expand the record. The record is what the record is, and Your Honor has recited it faithfully. But, again, the question isn't does Ms. Rader walk out of oral argument today and get a big fat check from the government? The question is much narrower, which is does Ms. Rader get an opportunity to present those facts and others to a trier of fact to determine? You really wouldn't say this is a Cortan case, would you? I'm sorry? You really wouldn't say this is a Cortan case. And I'm from Idaho, so I may say this wrong. K-O-R-T-A-N versus California Youth Authority. There's a case where there were many comments to different employees. There were many types of things. In fact, they called P. Medea. I mean, it was a pretty bad case. We said no. Well, I think every case is sui generis to the extent that, I mean, does it rise to that level of multiple phrases or multiple comments? No, it doesn't. But is it enough to go to the jury? Where do we draw the line? When do we take a case away from a jury and say as a matter of law it's not enough? Do you really believe that the sexual harassment claim is your best? No, actually I think that the religious discrimination is the best claim. Well, then I say you ought to turn to that. Let's go there. Well, what we have there are numerous instances where it is alleged that her direct supervisor, Mr. McOtto, referred to Jews as kikes. We have an allegation that another elderly Jewish woman in the office supervised by Mr. McOtto was fired, and then we have the open house situation where somebody dressed up and openly mocked a Hasidic Jew, and then finally we have, again, the timeline, what I would consider lack of coincidence, that on September 15th she's told she's working great, she's given greater latitude at work, more responsibility, more ability to work overtime. I mean, the things that you would give to an employee that you were considering was going to be staying with you. I mean, if you knew you were going to fire this employee on September 15th, why would you give her greater responsibility, the opportunity for overtime, and then the next day she asks for Yom Kippur off, and eight days later she's fired. What direct evidence do you have of discriminatory motive? Well, I think the facts here speak for themselves. When you have racial epithets and you look at the objective in Visia, and I know Judge Kaczynski says, you know, it's a probationary employee, so attitude counts. I agree attitude counts, but it seems to me here that- I mean, I looked at your evidence as it relates to the harassment and discrimination of the other female employee who was also Jewish, who was brought to tears and eventually fired. But I looked for evidence about this alleged employee or treatment, and I couldn't find any. I saw the allegations, but that's it. I guess I'm trying to come to something where you say Reeves is the case you've got to overcome in my book, which is an employer would be entitled to judgment as a matter of law if the record conclusively reveals some other nondiscriminatory reason. But if it's only a weak issue of fact, grant judgment. Well, I would say that this is not a weak issue of fact, because I believe, leaving aside the fact that they didn't bring in evidence of this other woman- There's no evidence about her anyplace. No, I understand that. There's no evidence that she was fired as a result of her religion. In fact, she was granted what she wanted. I went through each one of these. That's why I stopped you the first time. I was trying to- she asked for this. She got it. She went through everything she wanted. Now, she may not have got it as fast as she wanted. Well, but I would argue that as thin as Your Honor believes the allegations are, I think the explanation for her firing is even thinner. She has one on-the-record dispute with her direct supervisor for which she apologizes. And as I've said now three times, she's been granted more responsibility at work, right, to engage in overtime. And then at the very last minute, she asks to change her day off to coincide with the Jewish holiday. And you combine that with the other evidence of the epithet kike being used on multiple occasions, the mocking of a Hasidic Jew- Hold on just a minute. You can't really say that. On 5-27, Magtoto- I don't know how you say his name exactly- told radar several people approached him regarding her attitude. Trainers commented on her argumentativeness and her hesitancy to participate in training. On 6-10, he attempted to show her how to properly reconcile unadded files. She didn't listen or follow directions. On 8-4, radar questioned the procedure regarding the files, and when unhappy, she muttered, You're the boss. I say that often, but I get killed at home. 9-1, radar argued with Magoto about the resolution of a visa issue. Magoto finally told her to stop arguing and told her to enter the resolution. I mean, if I go down through here trying to document what there is to say that they had a valid reason, I got plenty. And at the end of the day, I can, on the other side of the ledger, point to the epithets and point to the positive comments about her work and say that that doesn't add up. And so where does that bring us? Ultimately, it brings us to where I think this case belongs in front of a trier of fact. That's the bottom line. Okay, thank you. You're over your time. Let's hear from the defendant. Oh, I'm sorry. I think I'll ask my question to the government. Thank you. I'll refer right to the DHS. Good morning. May it please the Court, Assistant United States Attorney Richard Park on behalf of Defendant Appellee, the Department of Homeland Security. Appellant's attorney started with a timeline in this case, and I'd like to present a full description of this timeline. From the very beginning, Ms. Rader, the appellant here, suffered problems at work. Her very first mentor assigned to her in the very first weeks of her employment described her as very difficult to work with and difficult to train. Ms. Rader went out of state for training and then returned in May and was assigned to a different mentor. That mentor, Ms. Wong, also experienced difficulties in training Ms. Rader, finding her to be argumentative, hesitant to follow instructions, and communicated those problems to her supervisor, Mr. Magtoto. Mr. Magtoto did the right thing. He took Ms. Rader aside, counseled her that several employees were having problems with her, told her to improve her attitude and her conduct at work. We can see that over the course of the next weeks and months, that conduct did not improve, and eventually in September, the decision was made that Ms. Rader should be removed during her probationary period. Okay, counsel. Judge Gould, if I could ask you a question, please. The parts of the case that bother me in terms of summary judgment. First of all, if it's true, what you're saying, reasons why she was not satisfactory, and I can understand that. And there certainly is evidence that she was trouble with a capital T, and they had a warrant to terminate her. But on the other hand, there's contrary evidence. So where I'm oriented from is thinking, why is this not a question for a jury? Now, the two pieces of evidence that give me the most pause are, first of all, she's terminated, as her lawyer argues, just days after requesting religious accommodation for a young kipper. And she does get that allowed, but she gets some verbal resistance, and then she's terminated. So why can't, in the context of there being other evidence of racial epithets, views calling people kikes, why wouldn't we say that the termination so close after her request for the day off for a Jewish holiday could be inferred to be causally related to that? So that's my question on religious discrimination. And the second, sex discrimination. I find the statement by the supervisor while asking her to be getting terminated to be way beyond the pale, to say, too bad you didn't F me. And so I'm wondering, why would that not carry as a logical inference, an inference that if you had F'd me, you would not have been terminated? So why wouldn't that evidence permit a rational jury to conclude she was terminated because she didn't accept quid pro quo discrimination? Allow me to answer your second question first. The test here is going to be, there's going to be a genuine issue of material fact if there's enough that a reasonable juror could render a verdict in favor of the plaintiff here. For your question on whether or not that statement that was allegedly made on the way to her and on the way to her receiving notice of her removal was enough to infer some sort of sexual discrimination in the workplace, I submit to you that it wasn't. Under either theory that's been posed in this case, that is the quid pro quo theory of sexual harassment or hostile work environment, under either theory, that statement alone is not going to be sufficient. If we start with the hostile work environment type of theory of sex discrimination, what the Corten case, as Judge Smith alluded to earlier, requires is that a hostile work environment, it's going to be an environment that changes the conditions of employment. I understand. I'm not thinking of this as hostile environment, but more as a quid pro quo. Sure.
judges: Kozinski, Gould, Smith